UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

UNITED STATES OF AMERICA,

               -against-                            21-cr-318 (KMK)

PARTICK GRAHAM,

               Defendant.

-------------------------------------------------------------- X

## MEMORANDUM IN AID OF RESENTENCING
## ON BEHALF OF PATRICK GRAHAM

      Defendant Patrick Graham submits this memorandum in aid of his resentencing, scheduled for May 30, 2023 at 11:30 AM. For the reasons set forth below, it is respectfully requested that the Court impose upon Mr. Graham a below-Guidelines sentence of time-served, which will amount to 11-months imprisonment.

      While the charges in this case are serious, we believe that there are a multitude of factors that support the requested sentence. Mr. Graham did not set out to commit a criminal offense. He had guns locked in a safe inside his home. He never carried any of the weapons or otherwise used them. He is a hardworking family man. Mr. Graham accepts full responsibility for his conduct, and nothing herein is intended to minimize or excuse it. He is truly remorseful for his actions and his current incarceration has been a particularly harrowing experience as he watches his family suffer for his mistake.

      It is respectfully submitted that when the Court considers all the facts relevant to Mr. Graham's resentencing, it will find that a sentence of time-served is "sufficient but not greater than necessary," to meet all of the sentencing goals embodied in 18 U.S.C. § 3553(a).

I.     **BACKGROUND**

A.     **Procedural Background**

On March 22, 2022, the Court sentenced Mr. Graham to 37 months imprisonment. On

June 27, 2022, Mr. Graham filed a motion pursuant to 28 U.S.C. § 2255 to vacate his conviction,

or in the alternative, to vacate his sentence. On May 9, 2023, the Court heard oral argument on

the motion and granted Mr. Graham's motion to vacate his sentence.

Mr. Graham self-surrendered on July 5, 2022, and has been incarcerated at FCI

Allenwood. On April 27, 2023 he was transferred to Lewisburg, where he was held for six days.

On May 2, 2023, he arrived at MDC Brooklyn, an administrative security detention center, and

remains there at the present time.

B.     **Patrick Graham's Personal History**

Patrick Graham is a 41 year old man, married with four children. He grew up in a

middleclass, loving family in Yonkers, New York. His father was employed by the New York

City Department of Sanitation and his mother worked part-time at a local pharmacy.

While Mr. Graham initially attended high school, he dropped out so that he could work

full-time and help financially support his family. Beginning in 2001, Mr. Graham worked as a

technician in gas detection for Environmental Energy Associates. The position required Mr.

Graham to work in confined spaces in sewer treatment plants. Since 2010 and up until his

surrender in the instant case, Mr. Graham was employed as a journeyman ironworker for FMB,

Inc., a steel fabrication and contracting company. Mr. Graham worked long days, often traveling

800-1,000 miles a week. Notably, FMB, Inc., is ready to re-hire Mr. Graham upon his release

from prison. <u>See</u> Exhibit A, letter from Vice President of FMB, Inc. ("Mr. Graham possessed a

strong skillset for Ironwork which was missed after his departure. Should Mr. Graham be

released from prison, FMB, Inc., would be happy to bring him back into our employment in his prior capacity as an Ironworker.").

In 2009, Mr. Graham married Annemarie Graham. The two met in Church when they were teenagers and have been happily married for the last 24 years. Together they have four sons, currently ages 23, 11, 4 and 1.5 years old. Their oldest son, who Pat and Annemarie had when they were in their early 20s, like his father, is employed as an iron worker. Before she had her three youngest children, Annmarie worked as a medical assistant. She is currently a stay-at-home mother raising their children, and Pat is the sole financial provider for the family. Mr. Graham has always played an integral role in his children's lives. See Exhibit B, letter of Annmarie Graham ("Patrick has made it a point to be part of his son's sports and school. He was assistant coach … and the boys prefer dad to help with their homework instead of me. … When Patrick comes home from a long day at work, he is never too tried to throw a football to his sons, mow the lawn and get a feed in with our youngest. … Our sons literally fight over 'their spot' for laying on top of their dad."). As discussed further below, the children have had a very difficult time during their father's absence.

Mr. Graham has a loving extended family and a large network of supportive friends. Common themes throughout the letters submitted on Mr. Graham's behalf are that he is a loving family man who works hard to provide for his family, who are his everything. See Exhibit B, letter of Barbara MacDonald ("Everything he does is motivated by his family which is evident by his amazing work ethic and kind heart. Seldom do I ever see him take a vacation day off from work and that is because he is constantly hustling to provide the best means for his family."); see id., letter of Brianna Buck ("He is truly a genuine, hardworking, family-man that constantly puts everyone's needs above his own. The accusations against him, are not exemplary of this man's

character ….."); see id., letter of James Natale ("As years go on, I realize the moral fiber Patrick possess. He is generous, considerate, passionate, kind, patient and most importantly a true family man. He loves his wife, kids and lives to provide for them.").

Mr. Graham's closeness with his four children is undeniable and it is not difficult to understand the extreme sense of loss they have felt since he has been incarcerated. See Exhibit B, letter of Patrick Graham ("My Dad is a hardworking man who loves his family. He wakes up at 4am every day to provide for all of us. He never complains about anything and is the easiest man to talk to, whether it is about sports or how to fix something, my Dad is the go to person. He is always there for everyone."); see id., letter of Jordyn Perry ("Uncle Pat … let me stay with him for ten weeks when I couldn't attend college due to COVID. During that time, I became extremely close with him and his family and was able to experience their family dynamic. As soon as he came home from work, his two middle boys were screaming his name, running to his car door. Every night he put his 2-year old … to sleep … He does everything for his boys and always wants to make them happy."); see id., letter of Pastor and Corrections Officer Robert Hargraves ("… I have observed an individual who is a man who works hard, and carries himself in a polite, respectable manner. In addition, Patrick is a family man who has always presented himself with levelheadedness and grace.").

The severity of his actions is not lost on Mr. Graham, who has expressed his sincere remorse for his actions to those closest to him. See Exhibit B, letter of retired NYPD Sergeant Edward J. Murphy ("Patrick has expressed his deep remorse for his actions and is ready to get on with his future no matter what his sentence. Without excusing his conduct I would respectfully request your Honor consider a non-incarceratory sentence as his wife and four children would be impacted greatly with no means of support if he received any considerable jail time."); see id.,

letter of retired NYPD officer and attorney Montgomery J. Delaney ("Patrick is a very kind young man and a gentleman. I know for certain that he has learned a tremendous amount from this experience and I truly doubt that he will ever see the inside of a courtroom again for any bad reason.").

### C. The Offense Conduct, Guidelines Calculation and Recommendation by Probation

On September 21, 2021, pursuant to a written plea agreement, Patrick Graham pleaded guilty to one count of being a felon in possession of a weapon, pursuant to 18 U.S.C. Section 922(g)(1).

In a locked safe, law enforcement seized three weapons. Two of those weapons were legally purchased by Mr. Graham's wife. Attached as Exhibit C is a copy of the July 2016 receipt for the purchase of two of the weapons that were found in the safe – the shotgun and AR-15. The receipt specifies "NY Compliant maglock" and contains Mrs. Graham's signature next to that notation. See id. Thus, these weapons, locked away in a safe, were legally purchased and had not been altered in any way.[1] The third weapon in the safe was a handgun given to Mr. Graham in satisfaction of an unpaid debt. Mr. Graham acknowledges that he should never have had possession of this handgun. He, however, never carried this handgun on his person and since the time he obtained the weapon, it has been locked in the safe in his home.

---

[1] At Mr. Graham's prior sentencing, the government referred to these weapons as "serious weapons" and "heavy firepower." That description is inaccurate. There is a popular misconception when it comes to AR-15s. They are not military style assault rifles. They are not automatic weapons; instead, they shoot one time per trigger pull. "AR" stands for the company name – Armalite rifle (the original designing company), not automatic rifle. Millions of Americans legally own AR-15s. It is a very popular gun because it is both lightweight and reliable. The .44 Magnum is a standard semi-automatic revolver. And the shotgun, is just that – a single shot, shotgun that only holds up to three shells. Shotguns are commonly used by bird hunters and trap shooters. None of these weapons would be deemed "heavy firepower" by a person knowledgeable about weapons.

With regard to the cash seized in the Graham residence, none of it was the proceeds of any illegal activity. Mr. Graham had a three-wheeled motorcycle that he sold on July 27, 2020 (only 45 days before the cash in the safe was seized by law enforcement) for $ 38,000.  Attached as Exhibit D is a copy of the bill of sale. The individual paid in "fresh-from-the-bank" looking $100 bills, and it was those bills that were found in the safe and seized by law enforcement. Furthermore, Mr. Graham had recently cashed a May 2020 bonus check that also accounted for some of the cash found in the safe.[2]

Under the November 1, 2018 edition of the Federal Sentencing Guidelines, the base offense level is 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(A); and there is a 2-point enhancement because the offense involved three firearms, pursuant to U.S.S.G. § 2K2.1(b)(1)(A). With a two-level reduction for acceptance of responsibility, and a one-level reduction for timely notice of intent to plead guilty, pursuant to U.S.S.G. §§ 3E1.1(a) and (b), the total offense level is 19.

Both the plea agreement and the PSR calculate four criminal history points. Three of those points are for an offense committed 15 years ago (criminal sale of a controlled substance in the third degree) and one point is for driving while impaired, from nearly 11 years ago. As discussed in detail below, the driving by impaired should not count toward Mr. Graham's carinal history.

Accordingly, the defense submits that Mr. Graham has three criminal history points and falls in Criminal History Category II. With a total offense level of 19 and a CHC II, the advisory Guidelines range is 33-41 months' imprisonment.

---

[2] Mr. Graham is an extremely hard worker. From 2016 to 2020, in addition to his regular salary, he received an additional approximately $70,000 in unused vacation bonus checks. See Exhibit E.

Notably, Probation recommended a non-jail sentence of three-years probation with a special condition of six-months of location monitoring. See PSR at p. 22. In making its recommendation Probation found "numerous mitigating factors":

> Following his only prior sentence of imprisonment, Graham exhibited a positive adjustment to parole supervision with no violations, and he has remained entirely compliant with the conditions of his pretrial supervision to date while awaiting sentencing, thereby evincing that he is a suitable candidate for community-based supervision.
>
> Additionally, other than sustaining an alcohol-related driving conviction in 2013, the defendant had remained law-abiding following his discharge from parole by merit approximately 10 years ago in 2011. Moreover, unlike typical cases involving the unlawful possession of weapons by prior felons, Graham's conduct was not uncovered by the commission of new criminal activity, but rather the weapon was retrieved by happenstance during an investigation into what turned out to be unfounded allegations. The defendant is the sole provider for his wife and children, who would undoubtably be adversely affected by his absence from the home for even a short period of time. Graham had displayed what we view as genuine remorse for his criminal conduct and as understanding of the serious of this offense, and we believe that he is at low risk to reoffend after having undergone this federal prosecution.

PSR at pp. 23-24.

### D.   Patrick Graham's Incarceration

Mr. Graham has been incarcerated at FCI Allenwood since he self-surrendered on July 5, 2022. Upon his arrival, because the BOP was still being cautious about COVID-19 and had inadequate bed space, Mr. Graham was in the Special Housing Unit (solitary confinement) for 15-days.

Notably, Mr. Graham has had zero incident reports and zero disciplinary infractions while incarcerated. See Exhibit F at p. 1. He has worked as an orderly since August 2022. See id. Shortly after arriving, he enrolled in classes to obtain his GED and was awarded his GED on

February 27, 2023. See id. at p. 6. He also completed a 15 hour drug abuse program, as well as several additional courses offered by the BOP. See id. at p. 2.

While Mr. Graham has been a model inmate, the Probation Department was prescient in in its prediction that "his wife and children … would undoubtedly be adversely affected by his absence from the home for even a short time." PSR at p. 24. As noted in the PSR, Mr. Graham's wife is a recovering alcohol. See id. at p. 23. After five years of sobriety, she relapsed during the pendency of this case. After Mr. Graham's incarceration, she relapsed again and was admitted to a residential detox program. See Exhibit G. During this period of time, the children were in the care of Mrs. Graham's parents, who at advanced ages, struggled to care for the young children.

The children have also suffered significantly in the absence of their father. The second youngest, now 5 years old, would not attend pre-K without his father being home. Shortly after Mr. Graham self-surrendered, his second youngest son stopped eating and became sick. He was taken to the ER after a week of fever, abdominal pains and diarrhea and admitted overnight for observation.

## II.   ARGUMENT

Mr. Graham has spent the last 11 months in prison for a crime which he did not purposely set out to commit. As noted by Probation, "Graham's conduct was not uncovered through the commission of new criminal activity." PSR at p. 24. Mr. Graham made a horrible decision to store guns in a safe in his home. He has paid dearly for that decision. We submit that the punishment of watching his family suffer is worse than any sentence this Court may impose on him. Patrick Graham feels genuine remorse for participating in this offense and that remorse is sincere.

We respectfully submit that the applicable Guidelines range fails to achieve the objectives of 18 U.S.C. Section 3553(a), and that the Court should impose a non-Guidelines sentence of time-served (amounting to 11-months), which is "sufficient but not greater than necessary" than to meet the goals of sentencing.

### A.      The Applicable Legal Standard

As the Court is aware, the Sentencing Guidelines are advisory and while they serve as the starting point for a sentencing court's analysis, the inquiry does not end there. As noted in Nelson v. United States, 129 S. Ct. 890 (2009), where the Court summarily reversed the Fourth Circuit which had upheld a district court's application of a presumption of reasonableness to the guidelines:

> [t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Id*. at 892 (emphasis in original). Thus, the guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

When imposing sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)[3] in order to create an "individualized assessment" based on a defendant's particular circumstances. Gall vs. United States, 552 U.S. 38, 49-50 (2007); see also United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The result is that "[a] sentencing

---

[3] The relevant factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed" to, inter alia: provide just punishment, deter criminal conduct, protect the public from any future crimes by the defendant, and provide the defendant with rehabilitative training and treatment; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established" for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." <u>Cavera</u>, 550 F.3d at 188.

The Court has ample discretion to impose a below-Guidelines sentence. <u>See</u> <u>Kimbrough v. United States</u>, 552 U.S. 85, 101-10 (2007). In doing so, the Court may consider, and rely upon, any information available concerning the background, character, or conduct of the defendant. <u>See</u> <u>Cavera</u>, 550 F.3d at 189-91; <u>see also</u> 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Moreover, in making an "individualized assessment," the Court is not only empowered to impose a sentence below the Guidelines range, but also required to do so where a lower sentence would be sufficient to comply with the purposes of Section 3553(a). <u>See</u>, <u>e.g.</u>, <u>United States v. Dorvee</u>, 616 F.3d 174, 183-84 (2d Cir. 2010); <u>United States v. Ministro-Tapia</u>, 470 F.3d 137, 142 (2d Cir. 2006). This is consistent with the long-standing principle that a Court consider "every convicted person as an individual" and to uphold "the principle that the punishment should fit the offender and not merely the crime." <u>Pepper v. United States</u>, 562 U.S. 476, 487-88 (2011). In sum, the overarching task of a sentencing court is to fashion a sentence that is appropriate for the individual circumstances of the offense and the defendant, and is "sufficient, but not greater than necessary" to achieve the statutory goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a).

### B.    Mr. Graham's Criminal History Overstates His Actual Criminal History

Criminal history category III significantly overstates Mr. Graham's actual criminal history. First, his sole prior criminal offense is from 2008 – *12 years* before the offense conduct

and *almost 15 years* from the present date.[4] Mr. Graham's other offense is a driving while impaired from *nearly eleven years ago*.

Notably, the driving while impaired offense is an infraction, a/k/a a New York State Vehicle and Traffic Law violation, which does not constitute a crime under New York State law. This infraction should not have received any criminal history points. See United States v. Potes-Castillo, 638 F.3d 106 (2d Cir. 2011) (holding that driving while impaired is not categorically counted when calculating a defendant's criminal history score and remanding the matter); United States  v. Gonzalez-Rivera, 2011 WL 4916395, *5 (S.D.N.Y. Oct. 17, 2011) (finding on remand that "a DWAI offense cannot be said to be 'categorically more serious' than a reckless driving offense," which is not afforded any criminal history points, and excluding the DWIA offense from defendant's criminal history calculation pursuant to 4A1.2(c)(1)).

Accordingly, in sentencing Mr. Graham, a variance for his overstated criminal history is appropriate. See United States v. Carrasco, 313 F.3d 750, 757 (2d Cir. 2002) ("This type of departure [pursuant to § 4A1.3] is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a [Criminal History Category] that overstates the seriousness of the defendant's prior record."); United States v. Mishoe, 241 F.3d 214, 219 (2d Cir. 2001) (holding that "the Court would be entitled on remand to consider whether to make a departure based on an individualized consideration of factors relevant to an assessment of whether [the defendant's criminal history category] 'significantly over-represents

---

[4] During his incarceration for this offense, the PSR notes that "Graham exhibited a positive adjustment to incarceration, whereby he did not commit any disciplinary infractions; participated in various programs and courses, including among others, those pertaining to GED preparation and welding; and he worked as a porter." PSR at ¶ 34. He also had a positive adjustment to supervision, testing negative for illicit substances and maintaining employment. See id.

the seriousness of [the] defendant's criminal history or the likelihood that the defendant will commit further crimes.' U.S.S.G. § 4A1.3.").

Further, as discussed above and noted on Exhibit C, given that two of the weapons were in fact legally purchased by Mr. Graham's wife, we believe that the two-point enhancement for possessing three weapons added to the offense level overstates Mr. Graham's actual culpability. This, it is respectfully submitted, is another reason in support of a variance.

### C.    Review of the Section 3553(a) Factors Weighs in Favor of a Sentence of Time-served

While the nature and circumstances of the offense are serious, we believe that the history and characteristics of Mr. Graham strongly weigh in favor of significant mitigation. At his core, Mr. Graham is hardworking, family man. He wakes up at 4am every day and works a full, long day. He often drives 1,000 miles in a given week. However, every day when he gets home, no matter how tired, Mr. Graham turns his full attention to his family. The letters of support are replete with descriptions of Mr. Graham's love and attention to his four boys.

As to specific deterrence, a sentence of time-served is adequate to serve the goals of specific deterrence. Over the last 11-months, Mr. Graham has watched helpless, as his family struggled with his incarceration. Not being able to accompany his son to the hospital or doctor while he struggles with his father's absence is a worse punishment than anything this Court could give him. Knowing his youngest child refused to go to pre-school because his father was not there is something that will weigh on him forever.

Mr. Graham has expressed sincere remorse to family and friends and we believe his intent to lead a law-abiding life is sincere. Counsel truly believes that Mr. Graham will never be before this, or another Court for the rest of his life. Prior to the instant offense, Mr. Graham's last involvement with the criminal justice system was in 2008.

Any additional period of incarceration would not provide any benefit to society. Mr. Graham is not a hardened criminal who needs to be incarcerated in order to keep the rest of us safe. The instant offense does not reflect his true character. He is a hardworking and caring family man who we believe has learned his lesson and will avoid any criminality in the future. As such, it is submitted that a sentence greater than time-served is not needed for him to fully appreciate the severity of his conduct and we submit that his risk of reoffending is extremely low.

It is also respectfully submitted that a sentence of time-served will provide adequate general deterrence to the criminal conduct of others. To the extent that the Court has observed that at least some potential offenders are deterred from committing future crimes by the sentences of others, we respectfully submit that a sentence of 11-months will produce that effect. The public is now on notice that the Courts may impose a jail sentence on those who commit crimes of the sort prosecuted here.

In addition, the effect of harsh sentences as "general deterrents" is questionable. Social science appears to undermine the notion that lengthy sentences will deter others from committing similar crimes. See Amy Baron-Evans, Sentencing by the Statute, pp. 7-9 (April 27, 2009, revised Dec. 21, 2010) ("…potential criminals … do not believe [that] they will be apprehended and convicted," and therefore, they do not "consider sentence consequences in the manner one might expect of rational decision makers") (citation omitted), a copy of Ms. Baron-Evan's article be found at https://nyn.fd.org/content/sentencing-statute-amy-baron-evans-2009. Because there is no evidence to suggest that sentencing Mr. Graham to a more severe punishment will lead to a reduction of crime through general deterrence mechanisms, it is respectfully submitted that the

requested sentence is "sufficient, but not greater than necessary" to achieve the statutory goals of deterrence.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a below-Guidelines sentence of time-served, amounting to 11-months.

## CONCLUSION

For all the foregoing reasons, Patrick Graham respectfully requests that the Court impose a sentence of time-served and one year supervised release.

Dated:  New York, New York
        May 18, 2023

                              Respectfully submitted,

                              MYERS & GALIARDO, LLP


                                        /s/
                              _____

                  By:    Matthew Myers, Esq.
                         52 Duane Street, 7th Fl.
                         New York, NY 10007
                         (212) 986-5900
                         MatthewMyersEsq@gmail.com

                         *Attorneys for Patrick Graham*